UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

JOSEPH VAN VELZOR,          )
                                 )
        Plaintiff,        )
                                 )      CIVIL ACTION NO.
VS.                           )
                                 )      3:12-CV-2508-G
CITY OF BURLESON,         )
                                 )
        Defendant.     )

## MEMORANDUM OPINION AND ORDER

Before the court is the motion of the defendant, the City of Burleson, to dismiss the plaintiff's third amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) (docket entry 41). For the reasons stated below, the motion is denied.

## I. BACKGROUND

### A. Factual Background

This case concerns alleged discriminatory practices of the City of Burleson, Texas against Joseph Van Velzor ("Van Velzor") and similarly situated disabled individuals. Van Velzor is 60 years old and has a degenerative bone and joint

disorder.  *See* Third Amended Complaint ("Complaint") ¶ 5 (docket entry 38).

Because of his disability, Van Velzor's mobility is substantially impaired, he

frequently must use a wheelchair, and he has been issued disability plates and

placards by the Texas Department of Motor Vehicles.  *Id.* ¶¶ 1, 5-6.  The City does

not appear to contest Van Velzor's status as a qualified individual with a disability.

*See* City of Burleson's Third Motion & Brief to Dismiss Pursuant to FED. R. CIV. P.

12(b)(6) ("Motion") at 1-2 (docket entry 41); Plaintiff's Response to Defendant City

of Burleson's Third Motion to Dismiss Pursuant to FED. R. CIV. P. 12(b)(6)

("Plaintiff's Response") at 1 (docket entry 44).

     Van Velzor's dispute with the City began in October 2011, when he visited a

Wal-Mart Supercenter store in Burleson and found that there were no unoccupied

"accessible" parking spots, or spots reserved for those with disabilities.  *See* Complaint

¶ 7.  Furthermore, some of the occupied accessible parking spots were taken by

vehicles that lacked the required accessible parking placards or license plates, in

violation of Texas Transportation Code § 681.011(b).  *Id.*  Van Velzor called the

Burleson Police Department about this violation and informed the dispatcher that the

illegally parked cars were preventing him from being able to park and enter the store.

*Id.* ¶ 10.  The dispatcher told Van Velzor that she would send an officer to address

the situation, but no officer arrived, and the dispatcher allegedly did not speak to

anyone about Van Velzor's call.  *Id.*

- 2 -

Van Velzor returned to the Wal-Mart Supercenter the next March, and found that the accessible parking spots were once again occupied by vehicles lacking the required placards or plates. *Id.* ¶ 11. He called the police department, but the department again failed to send an officer. *Id.* Later, Van Velzor spoke with the manager of the Wal-Mart and learned that store employees had called the police department to request enforcement of section 681.011(b), but that as with Van Velzor's calls, no officers ever arrived. See *id.* ¶ 12. Wal-Mart also sent a letter to the police department regarding the frequent illegal use of the accessible parking spots, but the City never responded. *Id.*

Van Velzor later learned that the City had established a special program, known as Citizens On Patrol (or "COP"), to handle violations of the accessible-parking law. See *id.* ¶ 15. Through the COP program, the police department outsources enforcement of this law to a group of volunteer citizens. See *id.* Van Velzor alleges that the COP program only handles violations of the accessible-parking law, and that the City retains its authority to enforce non-disability-related parking laws within the regular operations of the police department. See *id.* ¶ 15. Furthermore, Van Velzor claims that the police department dispatcher does not actually refer calls related to accessible-parking violations to the COP program, and that persons with disabilities are not able to contact the COP program directly, as it does not have a separate dispatch line. See *id.* ¶ 16. In effect, the COP program

allegedly does not provide disabled citizens with any actual means of having the accessible-parking law enforced.

In addition to his difficulties with accessible parking spots, Van Velzor asserts that the City refused to provide relief when he was denied assistance pumping gas, in violation of Texas Business & Commerce Code § 105.003(a) and § 105.005.  See *id.* ¶ 21.  When Van Velzor called the police regarding this violation, the dispatcher expressly told him that the police department would not help him with his problem. *Id.* ¶ 24.  Between his inability to pump gas and the lack of accessible parking spots, Van Velzor alleges that the police department's refusal to enforce disability-related traffic laws deprives him of the opportunity to access public accommodations.  *Id.* ¶¶ 9, 19, 23.

After the gas-pumping incident, Van Velzor went to the police department to complain about the lack of enforcement of disability-related laws.  See *id.* ¶ 27.  He spoke with an Officer Davis, who told him that the enforcement of these laws was not within the police department's jurisdiction, and that Van Velzor should instead talk to the District Attorney or the Federal Bureau of Investigation.  *Id.* ¶¶ 27-28.  Van Velzor next went to the Burleson City Hall, where he was referred to Deputy City Manager Paul Cain.  *Id.* ¶ 30.  Van Velzor explained the problems he had with the lack of enforcement of disability-related laws.  *Id.* ¶¶ 31-32.  As he was not yet aware of the existence of the COP program, Van Velzor suggested that if the City's police

department was not going to respond to calls to enforce the accessible-parking law, the City should deputize volunteer citizens to undertake that task. *Id.* ¶ 32. Cain allegedly did not mention the pre-existing COP program, evincing a lack of knowledge of the City's disabled parking policies. *Id.* Van Velzor later called Cain and requested that the City train its police officers to properly handle violations of disability-related laws, but Cain refused, stating that the City did not know how to conduct such training. *Id.* ¶ 33.

Van Velzor alleges that the City's violations of the Americans with Disabilities Act (ADA) extend beyond the refusal to enforce Texas Business and Commercial Code §105.003(a) and Texas Transportation Code §681.011(b), and that the City in fact does not enforce any laws related to persons with disabilities. *Id.* ¶ 34. He distinguishes this lack of enforcement from the City's policies related to non-disability-related laws, which he alleges are regularly enforced by the City. *Id.* ¶¶ 14, 17.

## B. Procedural Background

The court previously granted a motion to dismiss Van Velzor's second amended complaint, but granted him leave to amend to attempt to remedy the deficiencies in his complaint. *See* Memorandum Opinion and Order of July 12, 2013 ("2013 Opinion") at 20 (docket entry 33). On November 12, 2013, the plaintiff filed his third amended complaint, adding details to his allegations, and asserting

facts related to the existence of the COP program.  *See generally* Complaint.  On

December 10, 2013, the defendant filed the instant motion to dismiss the plaintiff's

third amended complaint.  *See* Motion.  The plaintiff filed a response, *see* Plaintiff's

Response, and the defendant filed a reply in support of its motion.  *See* City of

Burleson's Reply Brief Opposing Plaintiff's Response to Third Motion to Dismiss

("Defendant's Reply") (docket entry 45).  The motion is now ripe for decision.

II.  <u>ANALYSIS</u>

A.  <u>Legal Standards</u>

1.  *Motion to Dismiss Standard*

"To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead

'enough facts to state a claim to relief that is plausible on its face.'"  *In re Katrina*

*Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atlantic*

*Corporation v. Twombly*, 550 U.S. 544, 570 (2007)), *cert. denied*, 552 U.S. 1182

(2008).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not

need detailed factual allegations, a plaintiff's obligation to provide the grounds of his

entitlement to relief requires more than labels and conclusions, and a formulaic

recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555

(citations, quotation marks, and brackets omitted).  "Factual allegations must be

enough to raise a right to relief above the speculative level, on the assumption that all

the allegations in the complaint are true (even if doubtful in fact)."  *In re Katrina*

*Canal*, 495 F.3d at 205 (quoting *Twombly*, 550 U.S. at 555) (internal quotation marks omitted).  "The court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff."  *Id.*  (quoting *Martin K. Eby Construction Company, Inc. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)) (internal quotation marks omitted).

The Supreme Court has prescribed a "two-pronged approach" to determine whether a complaint fails to state a claim under Rule 12(b)(6).  See *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).  The court must "begin by identifying the pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."  *Id.* at 679.  The court should then assume the veracity of any well-pleaded allegations and "determine whether they plausibly give rise to an entitlement of relief."  *Id.*  The plausibility principle does not convert the Rule 8(a)(2) notice pleading to a "probability requirement," but "a sheer possibility that a defendant has acted unlawfully" will not defeat a motion to dismiss.  *Id.* at 678.  The plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not 'show[n]' -- 'that the pleader is entitled to relief.'"  *Id.* at 679 (alteration in original) (*quoting* FED. R. CIV. P. 8(a)(2)).  The court, drawing on its judicial experience and common sense, must undertake the "context-

specific task" of determining whether the plaintiff's allegations "nudge" his claims against the defendant "across the line from conceivable to plausible."  See *id.* at 679, 683.

## 2. *ADA Standards*

Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).  The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Public entities include "[a]ny State or local government" and "[a]ny department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1).  In general, to state a *prima facie* claim for discrimination under the ADA, a plaintiff must show:

> (1) that he is a qualified individual within the meaning of the ADA;
>
> (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and
>
> (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability.

*Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 671-72 (5th Cir. 2004), *cert. denied*, 544 U.S. 1034 (2005).

The regulations promulgated under the ADA specify a number of prohibited forms of discrimination. For instance, when providing any aid, benefit, or service, a public entity may not "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others." 28 C.F.R. § 35.130(b)(1)(ii). Furthermore, "a public entity may not . . . utilize criteria or methods of administration . . . [t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3)(ii). In other words, a public entity cannot actively undercut the ability of a public program to benefit those with disabilities.

In addition to bringing claims for denials of benefits or other forms of discrimination, disabled persons can also bring "reasonable accommodation" claims under the ADA. The regulations implementing the ADA require that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7). If modifications are necessary to avoid discrimination, the ADA and

Rehabilitation Act "impose upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals.  Where a defendant fails to meet this affirmative obligation, the cause of that failure is irrelevant." *Bennett-Nelson v. Louisiana Board of Regents*, 431 F.3d 448, 454-55 (5th Cir. 2005) (internal citation omitted), *cert. denied*, 547 U.S. 1098 (2006).  The accommodation must be sufficient to provide a disabled person "meaningful access to the benefit" or service offered by a public entity.  See *Alexander v. Choate*, 469 U.S. 287, 301 (1985).  If the court finds that an accommodation is required to prevent discrimination, the court must then determine whether the requested accommodation is "reasonable," or whether it would impose "undue financial or administrative burdens" or require a "fundamental alteration in the nature of the program." *Bennett-Nelson*, 431 F.3d at 455 n.12 (quoting *School Board of Nassau County v. Arline*, 480 U.S. 273, 288 n.17 (1987)) (internal quotation marks omitted).  In this regard, it is sufficient that the plaintiff "'suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits.'" *Henrietta D. v. Bloomberg*, 331 F.3d 261, 280 (2d Cir. 2003) (quoting *Borkowski v. Valley Central School District*, 63 F.3d 131, 138 (2d Cir. 1995)), *cert. denied*, 541 U.S. 936 (2004).  Once the plaintiff has done this, he "'has made out a *prima facie* showing that a reasonable accommodation is available.'" *Id.* (quoting *Borkowski*, 63 F.3d at 138).

In evaluating whether a plaintiff has stated a claim for disability discrimination, the application of the ADA and the Rehabilitation Act are substantially the same, and "[j]urisprudence interpreting either section is applicable to both." *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir.), *cert. denied*, 531 U.S. 959 (2000)). "The only material difference between the two provisions lies in their respective causation requirements." *Bennett-Nelson*, 431 F.3d at 454. Under Title II of the ADA, "'discrimination need not be the sole reason'" for the exclusion or denial of benefits to the plaintiff, see *Soledad v. United States Department of Treasury*, 304 F.3d 500, 503-04 (5th Cir. 2002) (quoting *Ahrens v. Perot Systems Corp.*, 205 F.3d 831, 835 (5th Cir.), *cert. denied*, 531 U.S. 819 (2000)), while the Rehabilitation Act requires a plaintiff to show that he or she was discriminated against "'solely by reason of her or his disability.'" See *Bennett-Nelson*, 431 F.3d at 454 (quoting 29 U.S.C. § 794(a)).

### 3. *Reconsideration of the Court's Previous Opinion*

Before the court can apply the above standards to Van Velzor's third amended complaint, it has concluded that it must reconsider some of the legal conclusions that it reached in its decision on the defendant's first motion to dismiss. Specifically, after reviewing the instant motion, the court concludes that it was incorrect regarding what constitutes a "service" or "benefit" under the ADA, that it misapplied the concept of

"discrimination" under the ADA, and that it should not have placed such great emphasis on deference to police enforcement decisions.

a.  Scope of "Benefit" or "Service"

Before a court can determine whether a public entity has violated the ADA, it must first define the scope of the "benefit" or "service" at issue.  *See* 28 C.F.R. § 35.130(a), (b)(1).  This court previously stated that the service or benefit offered by the City was "police enforcement of laws, considered generally," rather than enforcement of "traffic and parking laws."  *See* 2013 Opinion at 12-13.  Upon further consideration, the court now adopts a less restrictive approach to determining what constitutes a benefit or service under the ADA.

In reaching its more rigid definition of the benefit or service offered by the City in its earlier opinion, the court cited language from *Alexander v. Choate* that referred to Medicaid as a "package of health care services."  *See* 2013 Order at 12-13 (quoting *Alexander*, 469 U.S. at 303).  *Alexander* concerned a fourteen-day limitation on inpatient coverage under Medicaid.  *Alexander*, 469 U.S. at 289-90.  The plaintiffs, who were disabled and required more than fourteen days of inpatient care, argued that this limitation disproportionately disadvantaged them and denied them meaningful access to the benefit offered by Medicaid.  *Id.* at 289-91.  The Supreme Court found that the plaintiffs' claim incorrectly framed the benefit offered by Medicaid as "adequate health care," when it was more properly characterized as "a

package of health care services." *Id.* at 303.  Since the Court found that fourteen

days of inpatient coverage would sufficiently serve 95% of disabled Medicaid

patients, it concluded that the fourteen-day limit did not deny disabled persons

meaningful access to the benefits of Medicaid.  *Id.* at 303-04.  The Court held that

given that level of access, any further complaints about the fourteen-day limit

amounted to demands for "equal *results* from the provision of state Medicaid," as

opposed to equal *access* to the provision of state Medicaid.  *Id.* at 304 (emphasis

added).[1]

*Alexander* thus stands for the proposition that if disabled individuals were

receiving meaningful access to Medicaid, complaints centered around "adequate

health care" and individual satisfaction with results were considered "too 'amorphous'

a concept to define the government service or benefit to which disabled persons may

assert a statutory right of access and accommodation."  See *Jones v. City of Monroe, MI*,

341 F.3d 474, 477-78 (6th Cir. 2003) (quoting *Alexander*, 469 U.S. at 303).

---

[1]     In its previous opinion, the court also cited *Heckler v. Chaney*, 470 U.S.
821, 831 (1985), for the proposition that due to "the unique nature of decisions not
to enforce," the benefit provided by law enforcement services "is neither divisible, nor
discrete, in the manner that many other benefits, programs, or facilities offered by
public entities are divisible, or discrete."  2013 Opinion at 13.  However, as discussed
more fully below, *Heckler* is actually distinguishable from the situation presented by
this case, and the court concludes that the ADA cases discussed in this section more
directly guide the court in determining the scope of the service or benefit offered by
the City.

However, *Alexander* does not actually address the *scope* of what constitutes a benefit or service under the ADA.

Fortunately, the Fifth Circuit provided some guidance on that question in *Frame v. City of Arlington*, 657 F.3d 215 (5th Cir. 2011) (en banc), *cert. denied*, __ U.S. __, 132 S.Ct. 1561 (2012). In *Frame*, the court found that "[t]he Supreme Court has broadly understood a 'service' to mean 'the performance of work commanded or paid for by another,' or 'an act done for the benefit or at the command of another.'" See *id.* at 226 (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 23-24 (2010)). Applying that definition, the court determined that "newly built and altered public sidewalks are services of a public entity," and that a city's construction of public sidewalks that were inaccessible to disabled individuals denied those individuals the benefits of that service. *Id.* at 226-27. The court focused narrowly on what the construction of that sidewalk, and the sidewalk itself, offered to the public, to determine that it constituted a service or benefit to the public. *Id.* Along those lines, the court held that "[w]hen a newly built or altered city sidewalk is unnecessarily made inaccessible to individuals with disabilities, those individuals are denied the benefits of safe transportation and a venerable public forum." *Id.* at 228. Importantly, the court considered the sidewalk alone to be a benefit, rather than focusing broadly on that sidewalk as a part of a city's entire portfolio of public works projects and evaluating whether disabled persons had meaningful access to the

- 14 -

entirety of the city's public works.  In other words, under *Frame*, a service or benefit, such as a sidewalk, can also be part of a larger category of services or benefits provided by a public entity, such as public works and thoroughfares.

Other courts have reached similarly all-encompassing concepts of what can constitute a service or benefit under the ADA.  See *Noel v. New York City Taxi & Limousine Commission*, 687 F.3d 63, 68 (2d Cir. 2012) (quoting *Innovative Health Systems v. City of White Plains*, 117 F.3d 37, 45 (2nd Cir. 1997) ("[T]he phrase 'services, programs, or activities' has been interpreted to be 'a catch-all phrase that prohibits all discrimination by a public entity.'"); *Kiman v. New Hampshire Department of Corrections*, 451 F.3d 274, 286-87 (1st Cir. 2006) (holding that providing prescription medications -- as one part of a prison's overall medical services -- constitutes a service, program, or activity under the ADA); *Jones*, 341 F.3d at 477 ("[W]e note that the benefit is not appropriately defined as free downtown parking generally, but rather as the provision of all-day and one-hour parking in specific locations."); *Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998) (concluding that "services, programs, and activities include all government activities" and that "the phrase 'services, programs, or activities' encompasses virtually everything that a public entity does").

Furthermore, and particularly relevant for this case, courts have analyzed discrete portions of law enforcement activities as separate services or benefits.  See

*Gorman v. Bartch,* 152 F.3d 907, 913 (8th Cir. 1998) (analyzing the discrete service or benefit within law enforcement actions of "post-arrest transportation appropriate in light of [the plaintiff's] disability," and finding that a police department's means of transporting arrestees could violate the ADA); *Hobart v. City of Stafford*, 784 F. Supp. 2d 732, 756-57 (S.D. Tex. 2011) (considering the specific service or benefit provided by police responses to mental health related service calls); *Salinas v. City of Braunfels*, 557 F. Supp. 2d 771, 775 (W.D. Tex. 2006) (quoting *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002), *cert. denied*, 539 U.S. 958 (2003)) (interpreting the ADA in the context of police interviews and finding that "[c]ourts have broadly construed the 'services, programs, or activities' language in the ADA and the Rehabilitation Act to encompass 'anything a public entity does'"); *Schorr v. Borough of Lemoyne*, 243 F. Supp. 2d 232, 235 (M.D. Pa. 2003) (holding that the ADA applies specifically to the use of force in police enforcement and arrests); *Independent Living Resource Center, Inc. v. City of Wichita, Kansas*, No. 00-1190-WEB, 2002 WL 539037, at *3 (D. Kan. March 15, 2002) (finding that "[t]he ADA applies to all activities of the City of Wichita, including its policies and practices relating to enforcement of handicap parking ordinances" and focusing specifically on whether Wichita had enforced those ordinances in a discriminatory way).

As with the Fifth Circuit's analysis of sidewalks in *Frame*, the enforcement of traffic and parking laws is a service or benefit that is a part of, but can also be

analyzed distinctly from, the benefit offered by police enforcement as a whole.  The

court concludes that this understanding of the benefit offered by the City in this case

is more in line with the ADA as interpreted in *Frame* and other ADA cases.  The court

will therefore consider whether the City denied Van Velzor the benefits of, and

meaningful access to, police enforcement of traffic and parking laws, rather than

police enforcement as a whole.

b.  "Discrimination" under the ADA

The court must also address the way in which it applied the concept of

discrimination under the ADA in its previous opinion.  There, the court stated that "a

public entity is required to make only those reasonable modifications that are

'necessary to avoid discrimination on the basis of disability.'"  2013 Opinion at 8

(quoting 28 C.F.R. § 35.130(b)(7)).  The court also focused on "whether the

existence of . . . a practice [of not enforcing disability-related laws] gives rise to a

plausible inference that the plaintiff has been provided an opportunity to benefit

from law enforcement services that is unequal to that of others in the City of

Burleson." *Id.* at 18-19.

However, ADA jurisprudence does not focus solely on this comparison-type

evidence.  Courts have found that a "public entity is not only prohibited from

affording to persons with disabilities services that are not equal to that afforded to

others, or not as effective in affording equal opportunity," *Henrietta*, 331 F.3d at 274,

but also the public entity "cannot prevent a qualified individual with a disability from enjoying any aid, benefit, or service, . . .  regardless of whether other individuals are granted access." *Id.* (internal citations and quotation marks omitted)  Therefore, a plaintiff is not required to "identify a 'comparison class' of 'similarly situated individuals given preferential treatment.'"  *Id.* at 273 (quoting *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 598 (1999) (plurality opinion)).  Instead, the plurality in *Olmstead* held that it was "satisfied that Congress had a more comprehensive view of the concept of discrimination advanced in the ADA," which was passed to stamp out the "unjustified 'segregation' of persons with disabilities."  *Olmstead*, 527 U.S. at 598; see also *Alexander*, 469 U.S. at 301 (focusing not on the access that disabled persons had to Medicaid compared to the access of non-disabled persons, but instead on the "meaningful access to which [disabled persons] are entitled").  Thus,

> The logical import of the regulations is that . . . a public entity is not only prohibited from affording to persons with disabilities services that are 'not equal to that afforded others,' or 'not as effective in affording equal opportunity,' but also cannot prevent a qualified individual with a disability from enjoying 'any aid, benefit, or service,' regardless of whether other individuals are granted access.

*Henrietta*, 331 F.3d at 274 (internal citations omitted).

Under this case law, the court will focus less on finding comparison evidence than it did in its previous opinion, and more on whether Van Velzor had access to the benefit of the police department's enforcement of traffic and parking laws.

c.  Deference to Police Enforcement Decisions

Lastly, the court concludes that the doctrine of deference to police enforcement decisions discussed in the court's previous opinion is not pertinent to this case.  In its previous opinion, the court quoted *Heckler v. Chaney*, 470 U.S. 821, 831 (1985), for the proposition that agencies have "absolute discretion" in making enforcement decisions, and *Town of Castlerock, Colorado v. Gonzales*, 545 U.S. 748, 760 (2005), for the principle that "[a] well established tradition of police discretion has long coexisted with apparently mandatory arrest statutes."  *See* 2013 Opinion at 11.  The court reasoned that because of this discretion, it needed to be careful to avoid "substitut[ing] its judgment for the department's regarding the allocation of law enforcement resources," *id.* at 19, and found that a police department's enforcement decisions could only violate the ADA if they were particularly "egregious" or "extreme."  See *id.* at 11, 14.

However, upon further consideration, *Heckler* and *Town of Castlerock* actually appear to be distinguishable from the situation presented by this case.  In *Town of Castlerock*, a woman sued a police department for failing to enforce a restraining order.  See *Town of Castlerock*, 545 U.S. at 751.  She alleged that the department had a policy of not enforcing restraining orders, and that this policy violated her due process rights.  *Id.* at 754.  The Supreme Court rejected this argument and held that due to the general discretion provided to law enforcement, she did not have a "personal

entitlement" to the enforcement of restraining orders, and therefore could not have a due process right to such enforcement. *Id.* at 766-69. Similarly, in *Heckler,* a group of death row inmates facing lethal injection sued the Food and Drug Administration seeking to have the agency enforce regulations related to the use of drugs for unapproved purposes. *Heckler,* 470 U.S. at 824-25. In analyzing the ability of courts to review agency action under the Administrative Procedure Act (APA), the Court reasoned that agencies must be granted broad discretion in determining how to balance their enforcement resources. *Id.* at 831-32. The Court thus found that agency decisions not to enforce regulations were granted a presumption of unreviewability under the APA, *id.* at 832-33, and held that the plaintiffs had not overcome that presumption in that case. *Id.* at 837-38.

The situations in *Heckler* and *Town of Castlerock* would be similar to that in this case, but for the passage of the ADA. Van Velzor would just be suing the police department to have them enforce state laws related to disabled persons, and without the ADA, the court would have to dismiss his claim because he could not claim a "personal entitlement" to the enforcement of these laws. See *Town of Castlerock,* 545 U.S. at 766. However, the ADA actively and explicitly prohibits public entities from denying to disabled persons any of "the benefits of the services, programs, or activities" that the entities offer or from subjecting disabled persons to any other form of discrimination, 42 U.S.C. § 12132, and mandates that public entities "shall make

reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability."  28 C.F.R. § 35.130(b)(7).  In effect, the ADA "impose[s] upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals" to avoid discrimination, and "[w\here a defendant fails to meet this affirmative obligation, the cause of that failure is irrelevant."  *Bennett-Nelson*, 431 F.3d at 454-55.  The existence of the ADA thus changes the equation in this case -- Van Velzor is not suing the City simply because he is dissatisfied with the enforcement decisions the City made and wants to make it enforce specific laws that he feels are important, but because he feels that the lack of enforcement of these laws violates the "affirmative obligation" that the City owes him as a disabled person under a separate law, the ADA.

ADA jurisprudence further illustrates the manner in which the ADA can be applied to police departments.  For instance, in *Pennsylvania Department of Corrections v. Yeskey*, 524 U.S. 206 (1998), the Supreme Court found that even though certain issues -- in that case, state prisons -- were very important to state and local governments, those issues still had to be administered in compliance with the ADA. *Id.* at 208-09.  The Court acknowledged that "'[o]ne of the primary functions of government . . . is the preservation of societal order through enforcement of the criminal law, and the maintenance of penal institutions is an essential part of that task,'" *id.* at 209 (quoting *Procunier v. Martinez*, 416 U.S. 396, 412 (1974), overruled

on other grounds by *Thornburgh v. Abbott*, 490 U.S. 401, 414 (1989)), and that "'[i]t is difficult to imagine an activity in which a State has a stronger interest'" than the administration of its prisons. *Id.* (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 491 (1973)). Nonetheless, the Court held that "the ADA plainly covers state institutions *without* any exception that could cast the coverage of prisons into doubt." *Id.* (emphasis in original). In applying the ADA to the state prison in question, the Court made no mention of allowing the prison special discretion in its decision-making -- once it was established that the prison was covered by the ADA, it had to satisfy the ADA's requirements. See *id.* at 210-11. The Court observed that "[t]he text of the ADA provides no basis for distinguishing [the prison's] programs, services, and activities from those provided by public entities that are not prisons." *Id.* at 210.

Additionally, in *Pona v. Cecil Whittaker's, Inc.*, 155 F.3d 1034 (8th Cir. 1998), *cert. denied*, 526 U.S. 1131 (1999), the Eight Circuit analyzed whether a police department order that instructed officers not to enforce certain laws included the non-enforcement of a Missouri statute that prohibited discrimination against persons with disabilities. *Id.* at 1037. The court found that the non-enforcement order had not encompassed the antidiscrimination law, but reasoned that "[i]f there had been testimony that the Order was customarily understood as applying to [the antidiscrimination law], or if there had been evidence that there were other occasions on which the Order had actually been applied to [the antidiscrimination law], then

perhaps there would have been proof of a policy, practice, or custom sufficient to survive summary judgment." *Id.* Furthermore, the dissent, which disagreed with the majority's factual finding that the police department did not have a policy of not enforcing the antidiscrimination law, argued that "[s]uch a policy, which denies to disabled citizens a state-law right, and withholds from them, in that respect, law-enforcement services available to citizens generally, is inimical to the letter and spirit of federal law." *Id.* at 1040 (Arnold, J., dissenting).

Many other courts have similarly applied the ADA to law enforcement without mentioning special discretion. See *Hainze*, 207 F.3d at 799 ("The broad language of the statute and the absence of any stated exceptions has occasioned the courts' application of [ADA] protections into areas involving law enforcement."); *Gorman*, 152 F.3d at 913 (reversing the dismissal of a plaintiff's claim that a police department's post-arrest transportation policies discriminated against persons with disabilities); *Hobart*, 784 F. Supp. 2d at 756 (declining to grant summary judgment against a claim that the police had violated the ADA by "failing and refusing to accommodate police department operations for [disability-related] service calls, . . . discriminating in the provision of police services and emergency responses, and failing to conduct a self-evaluation plan for programs and services affecting persons with [disabilities]," and making no mention of special deference to police enforcement choices); *Salinas*, 557 F. Supp. 2d at 777 (showing no special deference in holding

that a police department may be required to provide an interpreter for deaf persons during police interviews); *Schorr*, 243 F. Supp. 2d at 235 (holding that, in a case where the plaintiff alleged that "the failure of [a town] to properly train the police for peaceful encounters with disabled persons caused [the plaintiff] to be discriminated against and excluded from" the benefit of "the appropriate use of force," "[n]othing in the language of the statute suggests that the ADA does not extend to this type of governmental activity"); *Independent Living Resource Center*, 2002 WL 539037, at *3-4 (finding that a city's program for enforcing accessible parking laws could be discriminatory, and holding that "an injunction prohibiting the City from continuing to violate the ADA would clearly be an appropriate remedy if a violation were shown").

It is also worth noting that the Fifth Circuit *has* specifically carved out an exception to ADA coverage of police enforcement, but only in the context of "an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life." *Hainze*, 207 F.3d at 801. The court felt the need to grant this discretion due to the difficulties created by "the onerous task of frequently having to instantaneously identify, assess, and react to potentially life-threatening situations." *Id.* The *Hainze* exception is applied narrowly, only in situations that legitimately present a threat of

imminent danger and call for this sort of instantaneous decision-making.  See *Hobart*, 784 F. Supp. 2d at 757-58; *Morais v. City of Philadelphia*, No. 06-582, 2007 WL 853811, at *12-13 (E.D. Pa. Mar. 19, 2007); *Salinas*, 557 F. Supp. 2d at 776. Furthermore, as the justification used by the *Hainze* court for creating this special exception does not apply to routine police enforcement of traffic and parking laws, there is no reason for this court to attempt to expand the *Hainze* exception to apply it in this case.

Therefore, the court concludes that it must apply the ADA to the Burleson police department in the same manner that it would to any other public entity.  As with the state prison in *Yeskey*, "[t]he text of the ADA provides no basis for distinguishing" the police department's "programs, services, and activities from those provided by public entities that are not" police departments.  See *Yeskey*, 524 U.S. at 210.

This is not to say that the City was afforded no discretion in its enforcement of disability-related laws.  In fact, the ADA grants several forms of discretion to public entities.  For instance, public entities are generally not required to provide certain benefits to the public -- the ADA simply requires them to provide those benefits equally for disabled and non-disabled citizens if they do decide to provide them. Furthermore, public entities cannot be forced to make any accommodations to their programs or practices that would impose "undue financial or administrative burdens"

or require a "fundamental alteration in the nature of the program[s]." See *Bennett-Nelson*, 431 F.3d at 455 n.12.  In effect, the ADA does not remove all discretion from a police department, it just requires the department to exercise its discretion in a manner that treats disabled and non-disabled persons equally.

## B.  Application

Van Velzor claims that the City violated the ADA in three main ways: (1) that the City did not enforce traffic and parking laws in a manner that was equally beneficial for persons with disabilities as for non-disabled persons; (2) that the COP program did not provide an effective alternative means of enforcement to standard police enforcement, and thus resulted in the City providing an inferior benefit to those with disabilities; and (3) that the City failed to make reasonable accommodations to its enforcement practices or to the COP program to grant those with disabilities meaningful access to the City's enforcement of traffic and parking laws.  *See* Complaint ¶¶ 42-57.

Taken as true, Van Velzor's allegations show that he was denied the benefit of the police department's enforcement of parking and traffic laws.  Van Velzor alleges that the police failed to enforce the accessible-parking law and the gas-pumping law for him on multiple occasions.  *See* Complaint ¶¶ 10-12, 21.  Furthermore, he was told by Officer Davis that the police department did not enforce disability-related laws, and by Deputy City Manager Cain that the City would not train its officers to

deal with violations of those laws. *Id.* ¶¶ 27-28, 30-33. Van Velzor also alleges that the police department does in fact enforce ordinary traffic and parking laws that benefit non-disabled persons. *Id.* ¶¶ 14, 17. It is true that even given these allegations, Van Velzor would still have access to some of the benefits of the City's enforcement of parking and traffic laws, such as the regulation of speed limits and the enforcement of stop-sign and traffic-light laws. However, Van Velzor's allegations show that the benefit he received from the City was "not equal to that afforded others." *See* 28 C.F.R. § 35.130(b)(1)(ii). Van Velzor states that because he was not able to pump gas or use accessible parking spots, he was not able to access many public accommodations at all, rendering the City's enforcement of other traffic and parking laws effectively meaningless for him. See *id.* ¶¶ 6, 9, 19, 23. If Van Velzor's ability to travel is indeed impeded to that extent by the police department's refusal to enforce disability-related laws, then he could hardly be said to have received an equal benefit from the department's enforcement of traffic and parking laws.

Still, the police department's unequal enforcement of disability-related laws may not have constituted a violation of the ADA had the department provided an effective alternative to standard enforcement through the COP program. However, Van Velzor alleges that the COP program did not constitute such an alternative. He claims that the police department's dispatcher does not refer calls regarding accessible-parking violations to the COP program, and that there is no other way to

contact the COP program.  *See* Complaint ¶¶ 28, 43.  He also alleges that he has

never seen a COP program volunteer actually enforcing the accessible-parking law.

*See* Plaintiff's Response at 7.  If non-disabled citizens are able to have their

complaints heard and responded to by the police department itself, while complaints

regarding accessible-parking violations are referred to the ineffective COP program as

Van Velzor alleges, then the police department is providing disabled persons with an

inferior service in violation of the ADA.[2]  See *Independent Living Resource Center*, 2002

WL 539037, at *3 (holding that a disabled plaintiff had stated a claim that an

inferior volunteer accessible-parking enforcement program violated the ADA).  This

method of administering the COP program would also "have the purpose or effect of

defeating or substantially impairing accomplishment of the objectives of the [COP]

program with respect to individuals with disabilities," in violation of the ADA

regulations.  *See* 28 C.F.R. § 35.130(b)(3)(ii).

Lastly, Van Velzor states a claim under the ADA that the City failed to make

reasonable accommodations to his needs as a disabled person.  He claims that the

City denied him access to police officers who could decide whether to enforce the

---

[2]        The City's arguments on this issue miss the point.  The City could not
avoid violating the ADA through the COP program by simply discontinuing the
program, as it argues, *see* Motion at 10-11, because then there would simply be *no*
attempt -- let alone an unacceptably inferior one -- to enforce the accessible parking
law, since the police department does not enforce that law.  Also, while the City may
disagree with a number of Van Velzor's factual allegations regarding the COP
program, see *id.* at 12, those allegations must be taken as true on a motion to dismiss.

disability-related laws in the same way they would decide whether to enforce other

laws, and that the City failed to accommodate disabled persons by refusing to train its

police officers to properly handle violations of disability-related laws. *See* Complaint

¶¶ 47, 49. Requiring disability-related training is generally considered to be

reasonable under the ADA. See, *e.g.*, *Schorr*, 243 F. Supp. 2d at 238 (holding that a

police department could be forced to conduct special disability-related training).

Furthermore, Van Velzor explains that his requested enforcement accommodation

would not cause an undue burden because he is simply asking for his calls to be

referred to officers for ordinary enforcement, the same way that calls regarding non-

disability-related violations are referred. *See* Complaint ¶ 51.

The City's counterarguments do not establish that either of these

accommodations would cause an undue burden for the City. The COP program

would not have to be altered in such a way that volunteers would be required to

confront violators, as the City claims. *See* Motion at 13. Rather, the police

department could start taking some enforcement action regarding violations of

accessible parking laws in conjunction with a more effective and accessible COP

program. Furthermore, these accommodations do not equate to forcing the police

department to tailor its "performance of services to the full satisfaction of a qualified

individual." *See* Motion at 14. The City would simply be required to make a few

reasonable accommodations to its practices so that persons with disabilities receive

meaningful access to the benefit that the City provides to its citizens through the enforcement of traffic and parking laws.

Van Velzor has thus stated a number of claims for violations of the ADA, and the City's motion to dismiss must be denied.

### III.  CONCLUSION

For the reasons stated above, the defendant's motion to dismiss the plaintiff's complaint is **DENIED**.

**SO ORDERED**.

September 4, 2014.

_A. Joe Fish_

**A. JOE FISH**
**Senior United States District Judge**